May it please the Court, Shiloh Hernandez for Appellant Alliance for the Wild Rockies. I'd like to reserve five minutes for rebuttal. Your Honors, this case is important because the Young Dodge Project, a massive industrial logging operation involving over 1,000 acres of clear-cutting in occupied grizzly bear habitat, imperils the survival and recovery of the tiny population of grizzly bears in the Cabinet Jack ecosystem. I'd like to take just one minute at the outset to underscore the plight of these bears. There are only 40 bears in the Cabinet Jack ecosystem, well below the minimum sustainable population of 100. In the three and one-half decades since the agencies developed a recovery plan for these bears, no recovery goals have been met, none. The bears are not recovering and the situation is worsening. The population has been in decline for a decade. Annual mortality rates have spiked due to a spate of shootings. And in the Young Dodge Project area, habitat conditions are dire. Road density is so high and core habitat is so low  This morning, I would like to focus on two points. First, the agencies violated the Endangered Species Act by failing entirely to address the synergistic impacts of locating six oversized clear-cuts directly adjacent to open and seasonally managed roads. And second, the Forest Service violated the Endangered Species Act by premising it's not likely to adversely affect conclusion on the demonstrably false premise that, and I quote, Young Dodge Project activities fall within the range of effects analyzed, end quote, in a prior biological opinion. The motorized access biop, which only addressed impacts from roads, not impacts from clear-cut logging. To my first point, the centerpiece of the Young Dodge Project are six oversized clear-cuts ranging from 100 to 500 acres in size. Each of which is right next to open or seasonally managed roads. The Fish and Wildlife Service has stated that clear-cuts, oversized clear-cuts as these, can adversely affect grizzly bears and can cause take. And their primary concern, their primary concern, is when these oversized clear-cuts are located directly adjacent to open roads as here. You cite, I think, Native Ecosystems Council for the proposition that the agencies failed to consider a threat to grizzly bears, namely oversized clear-cuts adjacent to open roads. Yet the Forest Service committed to implementing measures to reduce impacts on grizzlies, including a closure of roads for public use during and immediately after vegetation management activities. Doesn't that show that the Forest Service did not ignore the issue? It does not, Your Honor. And that is the agency's primary argument. They say, we mitigated the impacts so we didn't have to analyze them. The argument fails for three reasons. One, it's a post hoc argument that you don't find in the consultation documents. Second off, mitigation is no substitute for analysis in the first place. That's what this Court said in the Northern Plains Resource Council case. And third, the asserted mitigation is entirely illusory. The six clear-cuts are next to open and seasonally managed roads, and none of these roads that they're bordering on or that bisect these openings are going to be closed by this project during or after project activity. So mitigation, that's the principal means of mitigating the impacts of large clear-cuts next to roads is to close the roads. But here, all of them are next to open and seasonally managed roads and will remain that way during and after the project, including two major open roads. The problem with locating these clear-cuts – sorry. They said they're not going to do everything at the same time. They don't tell us exactly what they're going to do, how much is too much, but they do say they're not going to do everything at the same time. And I think they also said that the project would maintain high levels of habitat connectivity, provide more than 22,000 acres of secure core area to accommodate disturbed bears, create irregularly shaped oversize openings to reduce harm, and stagger timber harvests to reduce bear displacement. So why isn't that enough under our deferential standard of review? The reason is that the Court cannot defer to a void. And here there was zero analysis. Well, I said a few things, so it can't just be an entire void. That's correct. Those are impacts of roads or impacts of logging. But the real danger for large clear-cuts is when the synergistic impact of roads and logging together. That's what the Fish and Wildlife Service stated in a separate biological opinion. They said our primary concern is when we have these oversized clear-cuts right next to open roads because that will cause bears to underuse the habitat, or if they do use it, there will be an increased risk of being shot. And this is important because the agency, when they're trying to minimize the impacts of these oversized clear-cuts, they say, well, these clear-cuts will be good for bears because they'll create forage opportunities for bears. However, the best available science, Mason Manley, which is in the ER at 537, says that bears will not use oversized clear-cuts if they're next to open roads. It will negate the forage benefit. So here, by ignoring the combined impacts of roads and clear-cuts, it distorted their analysis. They were able to say that the clear-cuts would create forage for bears, and bears do forage in openings, but not if they're next to open roads. And that was the problem here. The fact that they're right next to open roads, that's the problem. And they didn't analyze this. They analyzed them separately, but really it's the combined impacts that are most deadly to bears. And again, shootings are the primary cause of human-caused mortality in the Cabinet Yak. That's where bears are killed. When roads, when people see bears, they can shoot them, and that's the problem here. The mitigation argument, if I may, just to continue on that, Judge Callahan, the agency cite another purported suite of mitigation measures that they say would reduce the impacts of clear-cuts next to roads, but they're all illusory. They talk about closing roads, but here all, as I said, are next to open or seasonally managed roads. So what about the oversized openings near these open roads? How will they increase the risk of shooting? Because bears, if they do use the opening for forage, then they'll be easily visible. They won't be able to hide behind trees, and people on the road see them, and they can kill them. The main causes of shootings in bears in the Cabinet Yak are spiteful killings, poaching, or mistaken identity. So somebody might see them and think they're a black bear and shoot them. Somebody might spitefully kill them because they don't like grizzly bears. These are real and important sources of grizzly bear mortality, and that's the combined impact. If there's just an opening, a natural opening in the forest far from any roads, that's good for bears, sure. The bears will forage there. But when the road's right next to the opening, that's the problem, and that's what the Fish and Wildlife Service said. That's their primary concern. Now the agencies, they say, yeah, but we'll leave some patches of trees in these openings, and that will mitigate impacts. That doesn't work, though, because in the EIS, they say, we'll leave thickets and clumps of trees if possible, but non-binding mitigation just doesn't count under the Endangered Species Act. The agencies further cite riparian corridors, which could shield bears from view from the roads, but that doesn't work here either because four of the six oversized clearcuts next to roads have no riparian corridors in them to create shielding. And the two that do are so shot through with open roads that no portion of the clearcut remains shielded from a road by one of the riparian corridors. And the court can see that in our further excerpts of record on pages 1 and 2. You can see the maps and the riparian corridors. So in the final important mitigation measure the agencies cite is this eccentric shape, as you mentioned, Judge Callahan, of the clearcuts. And the agencies, they talk about this in the record, and we cite it at pages ER 530 and further excerpts of record 6. They say an eccentric-shaped clearcut can mitigate impacts to bears provided, and this is the important caveat, that no portion in the clearcut remains greater than 600 feet from cover. And there's no question, it's undisputed here, that these clearcuts do have portions that are greater than 600 feet from cover. So the mitigation they cite, it doesn't even meet their own standard for mitigating impacts. To the second point that I wanted to address this morning, the supplemental biological assessment states, and I quote, Young Dodge project activities fall within the range of effects analyzed in the motorized access biological opinion, and therefore in itself is not likely to result in the loss of grizzly bears. This premise, the premise, is demonstrably false. The motorized access biological opinion expressly states that it does not address non-road impacts such as logging. Accordingly, the agency's conclusion was contrary to the evidence in the record and therefore arbitrary and capricious. Now the agencies, they contend that they didn't actually say that all the impacts, including logging, were analyzed in this roads biop. They say what they actually concluded was that only the roads are going to adversely affect bears, and all the other impacts, logging, helicopter use, and prescribed burns, will not adversely affect bears. That argument fails for four principal reasons, if I may. First, it's an improper post hoc rationalization. The Supreme Court in Michigan versus EPA said a court may not imply analysis, an analysis that's not apparent in the record. And here, nowhere in the record, and the court can search, I've searched, does the court, do the agency say that roads won't impact grizzly bears, won't adversely impact grizzly bears? And similarly, there's no place where they state that only road impacts will adversely affect grizzly bears. Second, their argument in litigation that only roads will adversely affect bears and logging, clear-cut logging, won't, it's contradicted by their statements in the record. First, the supplemental biological assessment, most importantly, and the agencies don't address this in their briefs at all, even though it's the most important statement, it says project activities fall within the range of effects analyzed in the motorized access biop. That's just incorrect because logging impacts, again, weren't in that motorized biop. Further, and this is another point that the agencies don't address in their briefs and maybe they'll address today, is that the record of decision in this case, there, and this is an excerpt of record 245. That's the April 2, 2012 record of decision that you're referring to? I believe so. It's at ER 245. The Forest Service expressly states that the impacts of the oversized clear-cuts were analyzed and that the project will likely adversely affect grizzly bears. Now, if, as the agencies contend, the Forest Service had actually concluded that logging won't affect grizzly bears, then they would have said it here. But they don't. They say the opposite. They say we analyze the impacts of logging, these large clear-cuts, and they will adversely affect grizzly bears. Further, their contention that the oversized clear-cuts will have no adverse effect on bears is contrary to the Fish and Wildlife Service's own statement in this other biop that large clear-cuts like these can adversely affect bears, can cause take, and that their primary concern is large clear-cuts right next to open roads, which is just the case here with six of them. And finally, it's inconsistent for the agencies to state on one hand that displacement of bears from roads, from 6,000 acres of roads, will adversely affect bears. But additional displacement on top of that, from three to five times as much habitat by logging, burning, and helicopter use, will not adversely affect bears. And I think this point is similar to a case that this Court has ruled on previously, Humane Society versus Locke. The citation is 626, Fed 3rd, 1040. I was going to submit a 28-J letter on this, but I read it a little late. That was the case about killing sea lions. And the Court said, the agencies made a mistake by focusing on a small problem, sea lion predation of salmonids, but ignoring the much larger problems of dams and fishing, which impact three to five times as much of the salmonid population. Similarly here, it doesn't make sense for the agencies to say, displacement from 6,000 acres due to roads will adversely affect bears, but displacement from 18,000 acres from logging, 9,000 acres from helicopter use, and 6,000 acres from prescribed burning on top of that will not adversely affect bears. If I may, Your Honors, sum up and retain the remainder of my time. In conclusion, grizzly bears in the Cabinet YAC are in real danger of disappearing. If the federal defendants wish to state that 1,000 acres of clear-cut logging will not adversely affect grizzly bears, then they need to adequately explain that finding, rather than ignoring the most serious impacts, large clear-cuts next to roads, and rather than trying to shoehorn their analysis of clear-cut logging into a prior analysis of road impacts, the Motorized Access Biop. The Alliance respectfully requests that the Court reverse and remand to the District Court with instructions to grant summary judgment. Thank you. Hello, Alan Durkee for the federal defendants. The Young Dodge Vegetation Management Project does include timber removal from a variety of harvest, using a variety of harvest methods on scattered locations within the Young Dodge Creek drainages. And with the exception of one small unit that is severely damaged, none of the utilized harvest methods are using clear-cutting. I just want to start with that because there's very different ways that appellants have been portraying what's going on in this project. And I think it's important to understand that the picture they're trying to paint isn't necessarily very accurate, and I don't think it's helpful to use terms that aren't actually describing what the harvest methods are. And in our supplemental excerpts of record at 43 and 45, it explains what the harvest methods are, and it has pictures. And what you'll see is that there are many trees left in these openings. And the overall purpose of these openings is to open up the canopy so that different kinds of vegetation that should be the natural type will have an ability to grow. And, of course, bears don't live in the canopy. So that kind of, you know, focus on the canopy percentages isn't necessarily that helpful. The other things where we sort of, you know, just to set the stage, so plants have chosen to focus on the large openings in the appeal today. So those large openings were designed very carefully, and the design from the get-go, and therefore it's not mitigation, it is the actual design of these large openings, is to leave trees and stringers when possible. I mean, that doesn't mean it's not going to happen. It just means that, of course, you can't do what's not physically possible. The riparian areas, in the reply brief they said there aren't riparian habitats, but what they cited does not show that. And, you know, my understanding is that there's, you know, riparian habitats, and, in fact, the connectivity that is going to be maintained is in part through the— There was a lot of—maybe you can help me here. There was a lot of discussion about oversized clear cuts adjacent to roads. Where in the record do the agencies analyze the impacts of oversized clear cuts adjacent to roads rather than simply oversized clear cuts? Well, it's not—I don't think, you know, it's exactly in those terms, but I think that there is certainly enough in the record that shows that they did consider the impacts of oversized— these, you know, larger openings that they're intentionally trying to create  And then there's the, you know, in the midst of planning for this project, then you have the access amendments and the biological opinion on that. And what they are—you know, the access amendments do take into account roads and the fact that, you know, that's the primary concern, you know, is access through roading. And it includes a description of some adverse effects and an incidental take statement. And the Fish and Wildlife Service, in their concurrence letter in this case, is, you know, is quite clear. And I think that, you know, it's not gotten enough discussion here because they want to focus on biological assessments, which aren't the decision document. It's actually the concurrence letter. And the Fish and Wildlife Service is the one that prepared that biological opinion for the access amendments. So the—and what they're saying is that those aspects of this project that go beyond what the access amendments, which is focused on roading and the impacts from roading, are not likely to adversely affect. And, you know, this goes to the second point my council addressed— my alliances council addressed today. And that is, you know, what was really decided. And I think that if you just look at the Fish and Wildlife Service concurrence letter, it's not hard at all to understand what was decided. You know, the question then becomes is, you know, was it what was decided arbitrary and capricious. But to focus on—or to say that what they decided was everything is in the access amendment, that's not what the letter says at all. That's the letter of March 9th, 2012, right? Yes. Yes. It excerpts a record 49 to 52. Yes. And it says several times that, you know, it doesn't go—it would not adversely affect the threatened bears in ways other than those analyzed. And then on the second page, again, it emphasizes that the potential for adverse effects are occurring in the baseline condition and the project would not result in any additional adverse impacts or incidental takeover of the baseline condition. Well, some of—he mentioned about post hoc justifications and that sort of thing. I mean, one of the things I think that you argue is that oversight clear cuts will not adversely affect the grizzly in part because of the revegetation and newly harvested portions of larger openings will provide hiding cover in 10 to 15 years. But isn't that what he's criticizing you for, that isn't essentially saying, don't worry about the project's negative effects on the grizzly now because it's going to eventually be better and it will grow back? First, on the post hoc rationalization arguments that they make on basically everything, one thing in particular on this issue, they did not comment about this issue in the administrative comment, you know, that they had opportunity. They did submit comments. They didn't raise the proximity of the large openings to the roads. And, you know, so it's a little bit maybe frustrating is the nicest way I can say about it, to say these are post hoc rationalization arguments when they don't raise it, and then that puts us in a position in the litigation of going through the record and showing you where these things were considered. Leaving that aside, I think that the post hoc argument—I'm sorry, I'm losing my train of thought there. And if I might ask, what was Part 2 of that question? I'm sorry. Oh, I think it was about that the revegetation in 10 to 12, 10 to 15 years old be better. So maybe it's not good right now, but it's going to be better. Right. So this goes to the point that there is not, as I heard suggested today, a deficiency in habitat. And he's correct. Bears generally won't use, you know, roads, you know, areas right next to roads without the cover. So basically you're talking about a period where they might be displaced, but the record very adequately supports over and over that there's plenty of habitat for these bears to use. What about the shootings? Excuse me? What about his suggestion, prediction, that with these oversized openings adjacent to open roads, it will facilitate increased shootings, risks to the grizzlies? Well, yeah, there was a finding here that the project would not appreciably increase mortality risk. That is in the biological assessment. And you have the Fish and Wildlife Service concurring that this is not going to be adversely affected. I should tell the court, and counsel is also aware of this, that the three openings that are – I mean, yeah, the three large openings that are in the vicinity of open roads, and they are not all directly up against them, by the way. You can see there's space in between and so on and so forth. But leaving that dispute aside, they have been harvested. So those openings, the timber has been removed. The three other openings that he has mentioned first time in the reply brief describe them as seasonally open roads. I'd like to just clarify that. So these are closed all year round to wheeled motorized vehicles. And what he is referring to is that there is allowance for snow vehicle use between December 1st and April 30th. Now, was this addressed and considered by the agency? Absolutely. At the FEIS, and the excerpt is a record at 278, it says the project does not propose any changes in motorized trails nor over the snow motorized access, both of which are accounted for and fall within – under existing conditions and fall within the scope of the access amendment. Furthermore, the concern with snowmobiles, as is described in the record, is when bears are denning, it has no adverse effect at all. And so what was mentioned in the reply brief was that, well, bears come out of their dens in, you know, early April and then this might – you know, just the snowmobiles would – I don't know how that links to the, you know, the harvest piece of it. But leaving that aside, that isn't even accurate because also in the record, it is – it's stated that no dens are known to exist in the project analysis area. That's excerpt to record 272. And the record also shows – so they're relying on the emergence in early April on a paper about a different area. But in our record, and referring to this particular area that we're talking about, they emerge – and this is an excerpt to record 468 – around the third week in April. And so – and then they said, well, they may get earlier, but they're relying on a climate change discussion in the FEIS that we're talking decades down the road. So that's not really what we're talking – I mean, all the focus here is on the short term. And I – you know, getting back to what do you do about the lack of cover for the 10 or 15 years these particular harvest units are developing hiding cover, I would like the court to also keep in mind – and this was – is also part of the consideration – the way that these openings are created is they're linking them with areas that have been harvested before. And the record says that those areas that are intermixed will have – So intermixed with all of this is cover. And I just want to, you know, disabuse the notion that what we're talking about is, you know, going to look like, you know, a golf course fairway. I mean, there is – there is a lot of vegetation still in there, and there's areas for the bears to move. And if the bears do not use the center of these areas because it's more than 600 feet from cover, that is not an adverse effect. Everything that elicits a response from a bear is not an adverse effect. Bears range over very large areas. They're habitat generalists. And it is often the case that simply because they move and, you know, forage somewhere else, that that is not an adverse effect. Well, one of the things that there was discussion about how the harvest outside the recovery zone, that things were going to be staggered and they wouldn't happen all at one time. But there isn't really any identification of a baseline, how much is too much, or anything along those lines. So what would be your argument as to why we should uphold an ultimate conclusion of no adverse effect where the agencies do not explain the impact of displacement or suggest, you know, how they're going to stagger this other than that they're going to? Right. Well, the project was scheduled to go from 2012 to 2018. It will probably take longer than that. So you've got a, you know, very long period of time that this project will be implemented. And, you know, the kinds of, you know, I think this is very clear that they have committed to doing it staggered in the decision document. And then the actual sort of timber cell details is not the kind of thing that you would ordinarily find in, you know, a record of decision for the project as a whole. So I think that's at a level of detail that, you know, typically wouldn't be. Stay out of the weeds for us. Is that what you're saying? Well, I think it is in the weeds and I think it is a matter of, you know, timber cell contracting. I haven't, you know, heard a complaint and, you know, that they're not staggering them. We know that much of the area has not been harvested yet. So, you know, it is happening, you know, or I think we can logically conclude from the fact that there are many areas that haven't been harvested and that there are some that have that it is being staggered. In the district court, Alliance attempted to raise a cumulative impacts claim under NEPA. The district court said it was waived because they didn't raise it in the administrative process. Is that correct? Yes. The cumulative impacts argument is really just a repetition of the, you know, large openings next to the road. So there's not really more to it than that. And they did not, I mean, they're relying on some concerns about mortality risk, but in their comments in the context, this was before the access amendments were adopted and so they were focused on roads. They, you know, their words like, you know, risk, mortality risk and stuff, but there never was flushed out what they're talking about now, which is the synergistic effect or, you know, cumulative effect. And the argument about the open areas next to the roads, was that thoroughly vetted in the administrative process by Alliance? Did they raise it? No. No, it was not vetted. They didn't raise that specifically, and I think if you look at the, you know, the pages of their comments they're pointing to, I don't think it really alerts the decision maker to that, you know, in order to come back and specifically address it. One last comment I would make about the sort of this issue of large openings near roads. Both parties have cited to the forest plan revision biological opinion, which actually postdates the ROD for this project here, but to the extent it is informative. They point, you know, they point out that, you know, they keep emphasizing the sentence that this is the Wildlife Service is concerned about this, but then ignore what follows, which says, you know, if you design it in these ways, then, you know, you eliminate the negative impacts, and that's exactly the way these were designed. And so, I mean, you have to look at the full discussion, I think, to understand that, you know, it goes back to consideration. Was it considered? Yes, because of the way they designed it. Was, you know, is there a response to a comment that says you said this, and this is our exact response? No, because that doesn't happen when you don't get the comment. Okay. Thank you. Thank you. Get the vodka. That's what I was waiting for. I appreciate it. All right, I'm just going to seriate and go through rebuttals to the points raised by my friend opposing counsel. The first, the question about clear cuts, there are different euphemistic terms that the Forest Service uses to refer to what they call regeneration harvest, which is cutting basically all the trees. One is clear cutting, which removes 95% of the canopy, and the other is seed tree harvest, which sounds great, but it's removal of 90% of the trees, which is just a little bit less than 95%. Counsel, in the previous case, said that bears don't care about the designation of roads. Bears don't care about the designation, whether or not it's a seed tree cut or a clear cut. The record, and I think it's at ER 522, the best available science is a paper by Mace Manley. They say bears' response to regeneration harvest, whether it be seed tree, whether it be clear cut, is the same. So we've used the term clear cut because we think it more accurately describes what's going on here, and the court is welcome to look at the citations cited by Ms. Durkee in the record between distinguishing between a seed tree harvest and a clear cut. They're very similar. One important point that, Judge Callahan, that you raised was their dismissal of short-term harms from these oversized clear cuts. They say, yes, we're going to have these clear cuts. Yes, they're going to have portions of them that are greater than 600 feet from cover, which is one of our standards for assessing impacts to bears, but don't worry, that will be fine within 10 to 15 years. Then the impacts won't be there. I think that, as you suggested, is an admission of adverse impacts. The Fish and Wildlife Service's handbook, which this court refers to and grants more deference to, says that impacts are not likely to adversely affect if they are wholly beneficial. Well, not here because they're going to impact them for 10 to 15 years. If they're discountable, which they mean to be something that's absolutely very unlikely to happen, that doesn't apply because we know these clear cuts are going to be made and we know they're going to have portions greater than 600 feet from cover. Then the third category of action that is not likely to adversely affect is insignificant. Insignificant actions are actions that cannot be measured and will never lead to the level of take. Here we're getting displacement. We know that in the baseline bears are being taken for displacement, so we have additional displacement, and it's very measurable. You can measure the size of these clear cuts in the area that the bears are going to be displaced from. The agencies do measure that in the biological assessment and the supplement. They say they're going to be displaced from 18,000 acres, which I contend is not insignificant. I believe you raised the question about shootings. I think that goes to the problem of—it's an issue that I didn't address this morning, but one of our issues in our briefs is that they don't adequately assess the mortality impacts of these clear cuts. They have this matrix for assessing impacts to grizzly bear mortality, and one is open road density and core. That standard's not met. One is the size of clear cuts. If they're less than 40 acres, that standard's not met. One is whether the clear cuts have any portions greater than 600 feet from cover. That standard's not met, but then at the end of their discussion they say, we think there will be no adverse impacts. It's just a conclusory statement. It doesn't follow from its premises, and we contend that that's arbitrary and capricious because they're not meeting their own standards for reducing mortality impacts, and it just doesn't make sense for them to then conclude that there will be no effect to mortality. Regarding the three openings that are next to large clear cuts, my friend has said that—sorry, the three large openings that are right next to open roads, and they're right next to them. You can look at our further excerpts of record, page 2. There's one portion where there seems to be a strip, but the rest of them, openings 1, 2, and 5 are right next to open roads. And my friend suggests that there's a hint of mootness. She said they've already been logged, so what's the problem? And I would say there's no concern of mootness here. I would point the court to its prior decision in Oregon Natural Desert Association, 625 Fed Third 1092. Even after the clear cutting's been done, the court can remedy the problem by closing the roads. That's the concern here. If the roads are open next to these clear cuts, even after they've been clear cut, the harm to bears can be remedied by closing the roads or decommissioning them. Regarding the three roads that are seasonally open, my friend mentions that the bears don't emerge from their dens until the third week of April. But in further excerpts of record, page 2, it says that these roads are open until the end of April. So there is overlap between bear emergence and use of these roads for snowmobiles. Okay. Just about got it. Thank you, Your Honor. Thank you. Thank you, counsel. Very well argued on both sides. Thank you. Very helpful. A lot here. Thank you, counsel. We appreciate your arguments. And the matter's submitted at this time, and that ends our session for today.
judges: Fisher, Paez, Callahan